Filed 11/17/17; pub. order 12/8/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of FRED and MOIRA KAMGAR.<br>_____<br><br>FRED KAMGAR,<br><br>　　Appellant,<br><br>　　　　v.<br><br>MOIRA KAMGAR<br><br>　　Appellant | G052024<br><br>(Super. Ct. No. 13D001145)<br><br>O P I N I O N |

　　　　　Appeal from a judgment of the Superior Court of Orange County, Thomas R. Murphy, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

　　　　　Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Appellant Fred Kamgar.

　　　　　Minyard Morris, Lonnie K. Seide, Fabio F. Foti; Snell & Wilmer, Richard A. Derevan, Todd E. Lundell; and Garrett C. Dailey for Appellant Moira Kamgar.

　　　　　　　　　*　　　　　*　　　　　*

Fred Kamgar appeals from a judgment ordering him to pay Moira Kamgar $1,952,056.50 for breach of his spousal fiduciary duties in failing to disclose to her that he risked in options trading an additional $8 million more than the $2.5 million in community assets she agreed he could trade in their investment account.  The trial court determined Fred's undisclosed and reckless trading resulted in a loss of almost $4 million, in addition to losing the initial $2.5 million.[1]  Fred contends the evidence does not support the conclusion he violated his fiduciary duties.  Moira in her appeal contends she was entitled to more than the $1.9 million award she received as her community interest in the $4 million loss.  But as we explain, the law and the evidence amply support the court's award, and we therefore affirm the judgment.

I

FACTS AND PROCEDURAL HISTORY

Fred and Moira were married in May 1990 and had four children together before they separated in late January 2013.  Highly educated, Moira began her studies at Harvard University at 16, then transferred to Sarah Lawrence College, where she received a bachelor's degree in international relations and Russian language studies.  She also earned a joint juris doctorate and master's degree in taxation.  Moira had not worked outside the home for over 20 years by the date of the couple's separation, but previously held positions at the Depository Trust Company and the law firm of Best, Best and Krieger.  Fred earned a bachelor's degree from USC in Electrical Engineering and Computer Science, as well as an MBA from UCLA.  During their marriage he ran several businesses, the sale of which enabled him to stop working over the last ten years of the marriage.

---

[1]  We use the parties' first names for clarity and ease of reference, and intend no disrespect.  (*In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1.)

Beginning in 1999, the parties had their liquid assets professionally managed successively by JP Morgan, Merrill Lynch, and then Bessemer Trust. Tiffany Barbara, who managed the Kamgars' funds at JP Morgan and Bessemer Trust, explained the Kamgars charged her to preserve their wealth, which aligned with the conservative financial strategies she pursued on their behalf at JP Morgan and Bessemer Trust.

Moira did not have much to do with the couple's finances from this point on, and left Fred with the basic management and control of the finances. Moira had not seen bank statements or financial documents since 2003, when Fred rented an office away from home and she did not have time to review the parties' tax returns each year. Fred made the investment decisions for the family during the last five years of their marriage, some of which were discussed with Moira. He occasionally would sign Moira's name to financial documents. Fred stated that he did not involve Moira with the family's finances because she was not interested.

In 2010, Fred began to research options trading, educating himself about the topic by taking investment classes, reading publications, and meeting with other investors. Fred had been investing community funds in Apple, Inc. stocks since 2002 or 2003, in part because he believed the company and its stock performance were predictable. With Moira's consent, Fred opened a self-directed trading account at TD Ameritrade (Ameritrade) and did some practice trades during the last half of 2011. Both Fred and Moira signed the Ameritrade account application and opened the account in the name of Kamgar Trust. Both Fred and Moira's consent was required for any transfer or withdrawal requests.

Fred explained his reasons for using Ameritrade to Moira, which included research showing it was the best platform for trading options and it charged a lower fee for trades; Moira did not object to his proposal. She agreed he could deposit $2.5 million in Apple stock into the account, which she believed represented a "sliver" of their net

3

worth.  As Moira later explained in her deposition testimony, Fred was free to use the $2.5 million to "try his hand at doing something that he would find interesting or amusing."  red chose this amount, which represented 24 percent of the parties' net worth, because it would create a dramatic profit if it "worked out," but losing the sum would not affect their lifestyle.

Fred's goal was to maximize the return on his trades.  He wanted to make enough money so the parties could live for the rest of their lives without needing to work. Fred transferred 6,000 shares of Apple stock, which was worth about $2.43 million, into the Ameritrade account in December 2011.  Fred then applied to Ameritrade for a "Portfolio Margin Upgrade Request" to allow enhanced margin trading, which dramatically increased the potential return — and risk of loss — in his option trading by using funds borrowed through the investment account to increase the value of the trades.

As a prerequisite for the upgrade, Ameritrade required Fred and Moira to pass a test demonstrating their financial knowledge and awareness of trading risks.  Fred testified that because Moira was not interested, he took the test for her and signed her name to the upgrade application.  Moira claimed she never authorized Fred to sign her name to the application.   Fred falsely represented on the application that he and Moira both had extensive options trading experience.  Fred also stated the couple's financial goals were growth, income, and conservation of capital, but not speculation.  In February 2012, Fred changed the Ameritrade account so he no longer would need Moira's signature to make withdrawals or transfers to the account.

Over the next 13 months, Fred converted the Apple securities in the account to cash and then, without telling Moira, deposited another $8,188,605 in community funds into the account, for a total community investment of $10,618,605. Moira did not know until just before their separation in January 2013 that Fred had replaced their professional financial managers, moving virtually all of the community's

4

liquid assets into the Ameritrade account. The trial court found Moira only authorized Fred to invest up to $2.5 million in the Ameritrade account.

Between the additional deposits and increases in value through options trades, often on margin, the Ameritrade account increased in value from the original $2.43 million in converted Apple stock to $2,691,000 in December 2011, then to almost $13 million at the end of February 2012. The account value declined in March and each of the next four months to an initial low of $10,046,000 in June 2012. Then it jumped slightly in value in July 2012, growing to about $10.5 million. The account value exploded in August 2012, reaching a peak end-of-the month balance of $16,322,000. As the court observed, Fred earlier withdrew more than $3 million, so the total account value likely crested above $19 million. Factoring in the withdrawal and trading losses, the next month saw the account balance decrease to $14,163,000 in September 2012. October was catastrophic, with a $10 million loss dropping the account value to $4,144,000. In November and December it dropped further, to $1,950,000 and $998,000, respectively, before Fred ceased trading in January 2013, with $409,000 left in the account.

Fred had continued investing in Apple options after the August peak because he believed the market would respond favorably to the pending release of new Apple products in the fourth quarter of 2012. The trial court found that, "[b]y August 31, 2012, all of the investments held in the brokerage account . . . were entirely concentrated in various call and put option positions held entirely in Apple stock (with about $502,000 of cash held)." Betting Apple stock would increase in value, Fred tilted his call option position to almost $10 million more than his put options, while also shorting put options.

"But," as the trial court described it, "between September 1, 2012 and January 31, 2013, the price of Apple shares dropped from about $642.14 to $441.68, a loss of 31.22%. [¶] By September 30, 2012, the account had borrowed $4.2 million of cash margin. In the month of October 2012, when Apple's stock price dropped from

5

about $630 per share to $557 per share, the TD Ameritrade account lost $9,718,900. For the remainder of the periods, virtually all of the positions [Fred] held in the account remained various and sundry Apple option positions. Between September 1, 2012 through January 31, 2013, another $780,000 of cash was also withdrawn from the account." Based on the initial deposit of almost $2.5 million in Apple stock, plus Fred's additional deposit of more than $8 million, the trial court observed that, "[i]n short, $10,618,605 of community funds are at issue, of which $3,805,000 was withdrawn and $6,404,113 was lost in trading activities."

At trial, Moira's financial expert testified that Fred's option trading was so highly speculative, particularly for lack of diversification, that it amounted to gambling. He explained that trading can still be negligent despite "exhaustive" research, but acknowledged there was no standard or definition in the financial industry for when ill-conceived trading amounted to gambling. Fred's financial expert observed that Fred's investment strategy had worked well in the first three quarters of 2012. He believed Fred had carefully managed the account and explained that there is a direct correlation between risk and making "serious money." The expert concluded Fred had not been negligent or grossly negligent in his investment strategy, noting that Fred had relied on other analysts who predicted a fourth quarter rise in Apple's stock value.

Moira testified Fred told her the account was performing "fine." Ameritrade sent the account statements to Fred's office in Corona Del Mar. Fred testified that by the time he received the statements in the mail they were outdated because he had online access to information. He acknowledged the couple's communication channels were "not that great."

The couple had been in marriage counseling from May 31, 2012, through early January 2013. The therapist noted that Moira had stated more than once during the sessions that "[s]he had no idea re[garding] the parties' finances." The therapist advised

6

them it was important to exchange information. The therapist did not recall whether she had urged the exchange "as early as summer 2012" or later, "on November 6, 2012," but was sure "only that both were advised re[garding] the importance of sharing financial information."

Fred never told Moira of any of the 2012 increases or decreases in the account value. In mid-January 2013, after the couple had been living in separate residences since October 2012, he texted Moira that there were financial "challenges" he needed to discuss with her. He wanted to meet in person, but she did not feel it would be "productive yet" for them to do so, requesting instead, "Just explain simply and generally." Fred declined, instead pressing in text exchanges over the next 10 days for an in-person meeting, while also urging Moira to sign the necessary paperwork to sell their Emerald Bay property. When Fred offered no explanation, Moira asked him who their current financial advisor was so she could get the information that way, but Fred eventually disclosed that he exclusively made the family's investment decisions.

After fruitless text exchanges in the ensuing days, Fred wrote: "Moira, I've been trying to talk to you for quite a while but you refuse. So here's the gist of our financial issues via t[e]xt. Unfortunately we are running out of money and really need to close the [Emerald Bay] sale. Between large investment losses, very high expenses, [a] Viva Terra [investment], construction, your 2nd house, carrying costs for 3 properties, . . . we will run out of cash in the next 2 mo[nths] which will create a financial disaster[.] So please sign the doc and let the sale close asap. We have major changes we need to make here soon for all our futures['] sake so please also start talking to me so we can work on them together[.]" Moira responded: "This is not a financial challenge," but rather a "disaster," remarking, "You have given no indication of this at all, either in your communication nor in your behavior." She also noted, "As for your options trading, you told me you were being prudent."

7

After trial, the court in a detailed statement of decision determined that Fred had breached his fiduciary duty to Moira by failing to disclose the "series of investment transactions made by him within the Ameritrade account between December 2011 and January 2013." Alternately, the court also ruled that Fred breached his fiduciary duty to Moira by grossly negligent mismanagement of the parties' assets in the trading account, and awarded Moira $1,952,056.50 as her share of community funds lost in Fred's undisclosed and reckless trading.

II

DISCUSSION

A. *The Trial Court Did Not Err in Finding Fred Breached His Fiduciary Duty to Moira*

Fred contends the trial court erred in concluding he owed Moira a fiduciary duty of disclosure though the parties agreed he would manage and control their Ameritrade account. He characterizes the court's finding he breached his duty of disclosure as tantamount to holding he was required to continuously update Moira on the daily performance of their investments and on each transaction in their investment account, at or near the time it occurred. He argues the purported duty of continuously updating a spouse on changes in investment values, or requiring his or her express permission for each and every transaction, is (1) impractical in today's fast-moving electronic market, (2) contrary to statutory provisions allowing each spouse to manage community assets, and (3) contrary to the everyday reality of marriage, which includes "an ongoing conglomeration of hundreds, if not thousands of overlapping financial decisions made by one or the other of the spouses."

Fred also challenges the alternative basis on which the trial court concluded he breached his fiduciary duty to Moira, namely, that Fred's "management of the parties' investment portfolio was reckless and grossly negligent."

8

The existence and scope of a fiduciary duty is a question of law that we review de novo. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.) However, "the factual background against which we [answer that question] is a function of a particular case's procedural posture." (*Id*. at p. 1214.) Thus, to the extent the court's decision below "turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard. [Citation.]" (*Baker v. Osborne Development Corp*. (2008) 159 Cal.App.4th 884, 892 (*Baker*).) Where there is a fiduciary duty, breach of the duty is a question of fact. (*In re Marriage of Duffy* (2001) 91 Cal.App.4th 923, 929-930.) We review the trier of fact's finding a breach occurred for substantial evidence, resolving all conflicts and drawing all reasonable inferences in favor of the decision. (*Ibid.*)

We first address Fred's claim the trial court erred by adopting an overly rigorous duty of disclosure, which led the court to erroneously conclude Fred breached this duty.

Family Code section 1100 specifies that each spouse is mutually entrusted with full individual authority to manage and control community property, including disposing of or otherwise alienating it (*id.*, subd. (a)), but each spouse also mutually owes the other a fiduciary duty with respect to the property (*id.*, subd. (e)).[2] Specifically, subdivision (a), provides in pertinent part that "either spouse has the management and control of the community personal property, whether acquired prior to or on or after January 1, 1975, with like absolute power of disposition, other than testamentary, as the spouse has of the separate estate of the spouse." (§ 1100, subd. (a).)

In turn, section 1100, subdivision (e), sets out in general terms that spouses owe each other a fiduciary duty in the management and control of their assets. That

---

[2]     All further statutory references are to the Family Code, unless noted.

9

subdivision provides: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty *includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable*, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request." (Italics added.)

With exceptions not pertinent here, section 721 states that "in transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following . . . ."

Section 721 then specifies certain enumerated but nonexclusive fiduciary duties, including: "(1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying. [¶] (2) Rendering upon request, true and full information of all things affecting any transaction that concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions. [¶] (3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived

10

from any transaction by one spouse without the consent of the other spouse that concerns the community property." (§ 721.)

Of the Corporations Code sections referenced in section 721, section 16403 sets out the disclosures required between partners. As pertinent here, it establishes in subdivision (c) the following rule: "Each partner . . . shall furnish to a partner, and to the legal representative of a deceased partner or partner under legal disability, . . . the following . . . : [¶] (1) *Without demand*, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partners' rights and duties *under the partnership agreement* or this chapter . . . ."[3] (Corp. Code, § 16403, subd. (c)(1), italics added [hereafter, section 16403(c)(1)].)

Quoting a respected practice guide, the trial court observed: "'The phrase in Corporations Code § 16403(c)(1) "reasonably required for the proper exercise of the partners' rights and duties" probably means, in the family law context, "reasonably required for the proper exercise [of the spouse's rights and duties in the management and control of community property]." Since each spouse has equal management and control rights, it appears they must provide the other 'without demand, any information concerning' the management and control of the community property. The failure to do so would be a breach of his or her fiduciary duty.'" (Citing California Family Law Prac. & Proc. (Matthew Bender & Co., 2d. ed. 2014) § 24.11, original brackets.)

Similarly, another treatise restates the statutory duty as follows: "**Duty despite no request:** Fam. C. § 1100(e) specifically adopts the scope of spousal fiduciary duties set forth in Fam. C. § 721(b) . . . . As amended effective 1/1/03, § 721(b) incorporates provisions of the Corporations Code . . . that impose fiduciary duties of

_____

[3] The partners also must disclose to each other: "*On demand*, any other information concerning the partnership's business and affairs, except to the extent the demand or the information demanded is unreasonable or otherwise improper under the circumstances." (Corp. Code, § 16403, subd. (c)(2), italics added.)

11

disclosure *even if there is no demand* therefor." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2014) ¶ 8.605.1, pp. 8-220 to 8-221, original bold and italics).

Fred repeatedly argues throughout his brief that the trial court's judgment amounts to imposing an unwarranted, expanded disclosure duty on the spouse managing a couple's financial affairs to "continuously update the other spouse as to changes in value of all assets under management." Phrased differently, he suggests the court's ruling requires "continuous updating of value during marriage on pain of sanction," makes a managing spouse who fails to provide continuous updates a "guarantor" of community assets invested in the stock market, and effectively held him "liable for failing to continuously disclose Apple's changing value to Moira," though the nature of contemporary investments is that their value changes "second by second in today's electronic market."

Fred emphasizes the utility and efficiency in having one spouse manage certain financial decisions and notes section 1100, subdivision (a), confers on the investing spouse "equal management and control of the community property, subject to certain restrictions." Indeed, that section grants the managing spouse authority to dispose of community assets. (*Ibid.*) Fred acknowledges as an overriding restriction the married couple's "governing fiduciary relationship[]," but contends, "Surely the appropriate interpretation is not that if the spouse who contemplates making a financial investment fails to have it continuously approved by the other spouse, he or she is guilty of a breach of fiduciary duty, subject to sanction if the investment loses money. If this were the case, no spouse would take on management of any asset of the community."

Fred creates a straw man by his repeated references to an asserted duty of continuous updating. The trial court in its detailed statement of decision never mentioned or imposed any such duty. Fred infers the court found a duty of continuous updating

12

because the court "did not identify at what point this breach of fiduciary duty occurred." Absent a specified date or dates on which the breach occurred, Fred apparently supposes the trial court believed the breach occurred every day — indeed every moment — he did not affirmatively disclose to Moira the Ameritrade account's performance in 2012.

But the trial court found Fred beached his fiduciary duty of disclosure when he unilaterally decided to put at risk and lose in options trading a sum *beyond the amount Moira agreed to risk.* The evidence at trial showed Moira *knew and agreed* to depositing up to $2.5 million in the Ameritrade account and that Fred was free to, in her words, "try his hand at doing something that he would find interesting or amusing." That expressly included options trading, as reflected in a later text message with Fred in which she referred to "your options trading." Accordingly, the trial court did not hold Fred liable for the eventual loss of the initial $2.5 million the couple mutually agreed to put into the account because she agreed to risk that amount.

But unbeknownst to Moira, in addition to the nearly $2.5 million initial sum, Fred unilaterally deposited an additional $8,188,605 of community funds into the investment account, and then saw those twin deposits (the initial $2.5 million and additional $8 million) both skyrocket and fall in recurring periods of gains and losses in options trading. Over the course of these fluctuations, Fred withdrew $3,805,000 of the $8 million amount, and then eventually lost all but $409,492 of the total community funds deposited in the account. The net result was that *of the additional, undisclosed* $8,188,605 Fred risked in options trading, he lost more than half, for a net loss to the community of $3,904,113. That loss did *not* include the loss of the initial $2.5 million because as the trial court specified in its calculation of damages, that $2.5 figure was the "Amt/invstmts agreed [to] by Moira."

The law and the evidence amply support the trial court's $1,952,056.50 award in Moira's favor against Fred for breach of his fiduciary duty of disclosure, as half

13

of the $3,904,113 loss incurred following his undisclosed decision to risk an additional $8,188,605 in community funds. Both parties overlook a key provision in the governing disclosure rules. Simply and quite obviously, the parties' disclosure obligations in a partnership, and in a marriage partnership under the Family Code's incorporation of Corporations Code section 16403, depends on their partnership agreement.

Section 16403(c)(1) states this principle expressly by limiting a partner's sua sponte duty of disclosure to "any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partners' rights and duties *under the partnership agreement . . . .*" (Italics added.) The trial court reasonably could conclude Moira and Fred's agreement concerning options trading was limited to investing $2.5 million in community funds. We must view the evidence in the light most favorable to the court's judgment. (*Baker*, *supra*, 159 Cal.App.4th at p. 892.) Indeed, the evidence plainly showed the couple had discussed the trading account and Moira only agreed to that amount for Fred to "try his hand" at trading, including options trading, but no more.

Consequently, the court also reasonably could conclude that in unilaterally deciding to risk the additional $8,188,605 in community funds, which was virtually all of the couple's liquid net worth, Fred interfered with Moira's equal right of management and control over those funds (§ 1100, subd. (a)). In other words, having secured Moira's agreement to risk $2.5 million in options trading, Fred breached his fiduciary duty of disclosure to his spouse by failing to disclose his intention to put another $8 million into such trades. Absent disclosure, he thwarted Moira's "proper exercise of [her] rights and duties" as a partner concerning those assets (§ 16403(c)(1)).

Because the trial court properly found Fred breached his fiduciary duty of disclosure, we need not consider his challenge to the sufficiency of the evidence to

14

support the court's conclusion he also breached his fiduciary duty in managing community assets by engaging in grossly negligent and reckless behavior.

B. *Moira's Appeal*

In her appeal, Moira argues the trial court erred in failing to credit her in the couple's property distribution a one-half share of the initial $2.5 million Fred deposited in the Ameritrade account and one-half of the $16 million figure the account grew to in August 2012. As we explain, the evidence supports the court's damage award.

Moira argues that while she knew of the $2.5 million transfer to the Ameritrade account and that Fred would engage in options trading in the account, she "had no idea of the volume of trades and risk Fred would undertake." Moira is correct that although "[s]pouses are not subject to the Prudent Investor Rule (which applies to trustees with regard to trust property) in managing and investing community property . . . , a spouse's *improvident C[ommunity] P[roperty] investments* can amount to a breach of fiduciary duty if they rise to the level of '*grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law*' (Corps. C. § 16404(c))." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2017) ¶ 8:606.2, italics in original.)

Here, however, the trial court as the trier of fact reasonably could conclude that under the parties' mutual agreement concerning the $2.5 million in the account, Moira had ceded management and control of those funds entirely to Fred. In other words, Fred held no sua sponte duty of disclosure for her to exercise her equal duty of control over those community funds because she had agreed to his use of those funds for options trading in his sole discretion. The court as the trier of fact also could infer from Moira's description of the funds as a "sliver" of their assets with which Fred could "try his hand at doing something . . . interesting or amusing" that *if* he lost the funds, it did not

15

matter to her *how* it occurred.  (§§ 721, subd. (b); Corp. Code, 16403(c)(1) [marital fiduciary duties defined by partnership agreement].)

Supporting this conclusion, Fred testified he selected $2.5 million as the deposit amount with Moira's agreement because losing it all would not require any change in the family's standard of living.  Accordingly, the court could infer from these comments that both partners recognized options losses could eradicate the $2.5 million and that in regarding the sum as but a "sliver" or trifling amount, Moira did not hold Fred to a fiduciary duty of care for those funds.  To the contrary, she viewed the account total as a disposable amount set aside for Fred's "amus[ement]."  Because we must view the evidence in the light most favorable to the trier of fact's conclusions, the deferential standard of review furnishes no basis to overturn the trial court's judgment.  (*Baker*, *supra*, 159 Cal.App.4th at p. 892.)

Moira also argues she was entitled to half of the $16 million peak value of the Ameritrade account.  She relies on the statutory remedy codified in section 1101, subdivision (g), which provides:  "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs."  The "transferred in breach" language supports the trial court's award of $1,952,056.50 because that is half of the nearly $4 million Fred lost of additional sums he transferred into the options account in breach of his mutual agreement with Moira.  He transferred an additional $8 million beyond the $2.5 million to which Moira agreed, but of the $8 million, he managed to pull out or salvage around $4 million, resulting in a $4 million net loss, of which the court ordered Fred to reimburse Moira her half share.

But in support of her claim the court instead should have awarded her $8 million as half the account's peak $16 million value, Moira relies on further language

16

in section 1101, subdivision (g), pegging the undisclosed or wrongfully transferred asset at "its highest value." Specifically, the statute provides: "The value of the asset shall be determined to be its highest value *at the date of the breach of the fiduciary duty*, the date of the sale or disposition of the asset, or the date of the award by the court." (*Ibid*., italics added (hereafter § 1101(g)).) We review for abuse of discretion the trial court's decision concerning the appropriate remedy for breach of fiduciary duty. (*In re Marriage of Schleich* (2017) 8 Cal.App.5th 267, 284.)

The trial court reasonably could conclude the date of the breach was the date Fred unilaterally decided to transfer an additional $8 million into the account beyond the agreed-upon $2.5 million, and of that $8 million, Fred lost half. Apart from the breach of fiduciary duty on the transfer date, the other two dates in section 1101(g) do not support Moira's argument for an award based on peak value of the account. In particular, an award of half the asset value at its disposition date would not support Moira's claim because it was precisely in "disposing" of — i.e., fulfilling — the options contracts that their negative value was realized. Similarly, Moira does not identify the value of the lost assets on the date of the court's award, but presumably there was no additional value to be realized because the option contract dates already had passed.

Citing the trial court's conclusion that Fred's risky options trading strategy constituted a breach of his fiduciary duty because it was so reckless, Moira argues that "the date of the breach" under section 1101(g)'s first prong is better viewed as a continuing period rather than a fixed date because Fred engaged in his risky strategy over a continuous period of time instead of in a single trade. She then argues that because the Legislature decreed the "value of the asset shall be determined to be its highest value at the date of the breach" (*ibid.*), the court was required to use the $16 million figure as the basis for Moira's award because that was the option account's highwater value over the period in which the court found Fred engaged in reckless trading.

17

Although Moira's interpretation is plausible, it does not comport with the Legislature's intent, as revealed by section 1101(g)'s legislative history. We interpret statutes de novo. (*Martin v. PacifiCare of California* (2011) 198 Cal.App.4th 1390, 1399.) "The primary purpose of statutory construction is to ascertain the Legislature's intent. . . . 'If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary.' [Citation.]" (*California School Employees Assn. v. Governing Bd. of South Orange County Community College Dist.* (2004) 124 Cal.App.4th 574, 583.) But if the statutory language "'leaves doubt about meaning, we may consult other evidence of the Legislature's intent, such as the history and background of the measure.'" (*Ibid.*)

Section 1101(g)'s use of "the date" of the breach, rather than "dates," and its use of the disjunctive "or" between three specified dates — the date of the breach of fiduciary duty, the asset's disposition date, or the date of the court's award — do not tend to support Moira's argument that the Legislature intended section's 1101(g)'s remedy for breach of a fiduciary duty to be calculated over a continuing period. But the word "highest" introduces some doubt because it could operate to tether the court's award to a particular date — the date of the asset's highest value — within a period of a continuing breach.

Section 1101's legislative history, however, reveals the Legislature expressly contemplated and rejected Moira's interpretation. Section 1101(g)'s current language was adopted in 2002. (Stats. 2001, ch. 703 (Assem. Bill 583), § 1.) Before the Legislature settled on that language, an earlier version of the bill used language consistent with Moira's notion of valuing a fluctuating asset at its highest point over the course of a continuing breach. The bill's draft language provided that "the value of the asset that is the subject of the breach shall be determined to be 'its highest value *from the time of nondisclosure to the time of the award*.'" (Sen Com. on Judiciary, Analysis of Assem.

18

Bill No. 583 (2001-2002 Reg. Sess.) July 17, 2001, p. 3, italics added (hereafter Sen. Judiciary Com. Analysis).)

The judiciary committee's analysis aptly observed: "A difficulty with the bill's proposed valuation method, however, is that it appears to assume that the breaching spouse's failure to sell an asset that may fluctuate markedly in value (such as stock) at a fleeting high point in that value represents a legitimate loss to the claimant spouse that must be recompensed, [but] the likelihood that the claimant spouse would actually have taken advantage of that limited opportunity may be speculative at best. For example, if the breaching spouse negligently managed, or fraudulently concealed, stock purchased at $50 a share, the stock climbed rapidly to $200 a share and immediately began to fall, reaching $5 a share at the time of the award, this bill's proposed valuation assumes the claimant spouse has the right to the stock at a value of $200 a share, even though, for most private citizens who own stock, the failure to convert shares at the highest point of value is a tale of woe much more common than a successful conversion at the highest price." (Sen. Judiciary Com. Analysis, *supra*., pp. 9-10.)

The committee proposed alternative language to preclude this outcome, as follows: "A possible alternative definition might be to value the asset at its *highest* worth on one of three alternative dates: the date the breach occurred; the date of sale of the asset, if a sale occurred; and the date of the award. In the above example, a breaching spouse who sold the stock for any amount above its $50 purchase price would be liable for the value at sale, whereas one who did not sell the asset would be liable at the $50 share price, even though the price had fallen to $5 at the time of the award. Such a definition would protect the claimant spouse from some market fluctuations, while at the same time avoiding an unduly speculative valuation." (Sen. Judiciary Com. Analysis, *supra*, p. 10.)

19

Because the Legislature not only reviewed the committee's proposed language, but adopted it verbatim, we infer the Legislature intended to reject the interpretation of section 1101(g) that Moira now advances. (See *People v. Wahidi* (2013) 222 Cal.App.4th 802, 808 ["'"[C]ommittee materials are properly consulted to understand legislative intent, since it is reasonable to infer the legislators considered explanatory materials and shared the understanding expressed in the materials when voting to enact a statute"'"].) As noted, the language the Legislature adopted at the committee's suggestion is not free from ambiguity. But in the context of the legislative history, it reflects a clear intent to reject the notion that the proper remedy under section 1101(g) for a breach of fiduciary duty is simply to select a fluctuating asset's highest value in the applicable period. Notably, the committee expressly proposed that the amended language would "appl[y] to all the duties subject to Section 1101 penalties, not just the duty to disclose assets." (Sen. Judiciary Com. Analysis, *supra*, p. 10.) Consequently, there is no merit to Moira's claim that the breach of fiduciary duty the trial court found in Fred's reckless trading of the couple's assets should result in a different award than for his breach by transferring additional funds into the account without disclosure.

Moira's reliance on *In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987 (*Hokanson*) for the propriety of dividing marital assets based on unrealized gains is misplaced. There, the wife ignored the divorce court's order for the expeditious sale of the couple's home, which in the 18-month interim declined $30,000 in value by the time it sold. The higher potential price from a prompt sale under the court's order formed a proper basis for an award to the husband of half the value lost due to the wife's delay. (*Id.* at pp. 994-995.) But unlike in *Hokanson*, there was no court order here for the sale of assets. More to the point, the committee analysis noted above expressly considered *Hokanson*, viewed it as authority for an award when the "managing spouse's conduct [is]

20

*first considered* to be in breach," rather than for the highest asset value over a continuing period, and we presume the Legislature in adopting the committee's exact proposed language similarly adopted this view.  (Sen. Judiciary Com. Analysis, *supra*, p. 9, italics added.)

## III

## DISPOSITION

The judgment is affirmed.  Moira is entitled to her costs on appeal.  Moira's motion to strike two references in Fred's reply brief to investment publications is denied as moot.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of FRED and MOIRA KAMGAR. | G052024 |
| _____ | (Super. Ct. No. 13D001145) |
| FRED KAMGAR, | ORDER GRANTING REQUEST |
| Appellant, | FOR PUBLICATION |
| v. | |
| MOIRA KAMGAR | |
| Appellant | |

The Association of Certified Family Law Specialists has requested that our opinion, filed on November 17, 2017, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

22

The opinion is ordered published in the Official Reports. (Cal. Rules of Court, rule 8.1105(b).)


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.