Filed 8/10/20; Certified for Publication 8/26/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of ERICA and FRANCIS DESOUZA. | |
| ERICA DESOUZA,<br><br>  Respondent,<br><br>v.<br><br>FRANCIS DESOUZA,<br><br>  Appellant. | A156311<br><br>(City & County of San Francisco<br>Super. Ct. No.<br>FDI12778498) |

Francis DeSouza appeals from a post-judgment order finding he breached his fiduciary duty to his former wife Erica and ordering him to transfer bitcoins and other cryptocurrency to her pursuant to the parties' judgment of dissolution and to pay her attorneys' fees and costs.[1]  Francis argues he did not breach his fiduciary duty because information he withheld about his cryptocurrency investments was not material and, alternatively,

---

[1] For clarity, we adopt the parties' practice of identifying themselves and other key actors by their first names.  We intend no disrespect by this practice.

1

there was no substantial evidence his breach impaired Erica's interest in their community estate. Neither point has merit. We affirm.

## BACKGROUND

I.      Francis Invests in Bitcoins

In January 2013 Erica served Francis with a petition for dissolution of marriage, along with an automatic temporary restraining order that, among other things, prohibited him from "[t]ransferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life."

In April 2013, Francis initiated three bitcoin-related transactions. On April 9 or 10, he wired $45,000 to Mt. Gox Company Ltd. (Mt. Gox), a Japanese bitcoin exchange, to purchase bitcoins. Francis never received any bitcoins for this money, nor recovered the transferred funds.

On April 10, 2013, Francis arranged for his friend and colleague Wences Casares to purchase 558.32 bitcoins from Mt. Gox for $99,451 on his behalf. Wences completed the purchase and transferred the bitcoins, along with an additional gift of five bitcoins (jointly, the Wences bitcoins), to Francis's digital wallet.[2]

On April 12, Francis had his associate Khaled Hassounah purchase an additional 498.89 bitcoins from Mt. Gox for $44,940

---

[2] A digital wallet is a secure storage method that can only be accessed by the holder of a private key.

2

(the Khaled bitcoins) on his behalf. Khaled was to transfer these bitcoins from his own Mt. Gox account to Francis's digital wallet. Although he bought the bitcoins as agreed, Khaled never completed the transfer and the 498.89 bitcoins remained with Mt. Gox.

In December 2013 and again in August 2014, Francis moved the Wences bitcoins from one digital wallet to another. In 2017 he learned that the Wences bitcoins had "forked," an automatic process that generates dividends from bitcoin holdings in the form of new currency, "bitcoin cash" and "bitcoin gold."

II. The Khaled Bitcoins Are Enmeshed in the Mt. Gox Bankruptcy

By April 2013, Mt. Gox was having regulatory difficulties with the U.S. government. On April 11 it briefly suspended trading. In June 2013 federal agents froze two bank accounts associated with the exchange and seized millions of dollars for its alleged failures to comply with federal regulations. Mt. Gox suspended withdrawals to be processed in U.S. dollars.

By late 2013 or early 2014, Mt. Gox lost hundreds of thousands of bitcoins to hacking, embezzlement, or both. Bitcoin expert Dr. Charles Evans testified for Erica that as early as March 2013, "anyone who was active on the Bitcoin discussion boards, anyone who was making an effort to get to know the Bitcoin community, knew that Mt. Gox was having trouble left, right, and sideways. [¶] And my personal opinion at the time was only an idiot would leave his Bitcoins on Mt. Gox." Dr. Evans reviewed emails between Francis, Khaled and Wences in the

3

spring of 2013. One such email from Wences to Francis advised him to "[b]uy your Bitcoins on Mt. Gox, then get the Bitcoins off and put them intoBlockchain.info," and led Dr. Evans to conclude Francis was aware of the problems with Mt. Gox when he arranged his proxy purchases in April 2013.[3]

Francis discovered by December 2013 that he could not get the Khaled bitcoins out of Mt. Gox. In February 2014, Mt. Gox halted all withdrawals and filed for bankruptcy. By May 2014, Francis knew of the bankruptcy. He hoped the situation would get resolved but made no effort to recover the Khaled bitcoins or

---

[3] In his written report, Dr. Evans elaborated that "Hack #I took place beginning as far back as 2011 through the time that MtGOX ceased operation. According to MtGOX CEO, Mark Karpeles, hackers siphoned off approximately 750,000 bitcoins held in reserve for customer accounts along with 100,000 of MtGOX's own bitcoins. This amounted to between 6% and 7% of the total number of all the bitcoins in circulation at that time, worth approximately $7.25 billion at current prices as of the date of this report.

Whether Hack # I indeed was a hack, in the sense of an external breach, or it was an 'inside job', remains the subject of speculation among persons who are interested in the MtGOX saga. Relevant here is not whether the theft was committed by external or internal actors, but that it was widely recognized that MtGOX was an accidental success, and its founder and chief executive was in over his head, as evidenced by email from Wences Casares to Francis DeSouza dated 22 March 2013, in which Casares instructed DeSouza, 'To buy bitcoin open an account at mtgox.com . . . To store and use bitcoins open an account at blockchain.info." . . . [¶] • Hack #2 took place in March 2014, concurrent with MtGOX's bankruptcy filing. In this instance, the hackers released a file called MtGox2014Leak.zip that they claimed was a database of MtGOX transaction records, with users' personal data intentionally removed.' "

4

the initial $45,000 he wired to Mt. Gox, which were tied up in the bankruptcy. He testified, "[t]here wasn't much money when they went bankrupt, so at the point it wasn't worth chasing them for little money, and now there's nobody to chase." Eventually Khaled filed a proof of claim in bankruptcy for the 498.8 bitcoins, which were still in his name, on Francis's behalf.

Francis filed his preliminary schedule of assets and debts in the divorce action in February 2014 and his final disclosure in July 2016. Both schedules disclosed his ownership of 1,062.21 bitcoins.

The parties' property issues were tried in February 2017. In September 2017 the court issued a final statement of decision, found the Wences and Khaled bitcoins to be community property and ordered them divided evenly in kind between the parties, along with any derivative cryptocurrency.

After entry of the dissolution judgment on December 8, 2017, Erica sought her half of the community bitcoins. Only then did Francis disclose that the Khaled bitcoins were tied up in the Mt. Gox bankruptcy. On December 18, 2017, the day after bitcoin's value hit a high of $19,783.06, Francis divulged that he possessed only 613.53 of the 1062.21 community bitcoins. In a December 22, 2017 email to his attorney copied to Erica's counsel, Francis wrote that "[t]he exchange I was using to buy bitcoins, Mt Gox, was hacked and then went bankrupt. I was able to take

out 613.53 bitcoins."[4]  Francis had also failed to inform Erica prior to the judgment that he used Wences and Khaled as proxies for his bitcoin purchases, that bitcoin cash and gold had been generated from the bitcoin investments, and that he transferred of cryptocurrency between digital wallets.

On December 31, 2017, the price of bitcoin was $13,500. The Khaled bitcoins had appreciated from their initial purchase price of approximately $45,000 to around $8 million.

III.    Erica Seeks Post-Judgment Relief

In January 2018 Erica moved for an emergency order compelling Francis to immediately transfer her full interest in community bitcoins to her and for remedies afforded by the Family Code for his failure to timely and adequately disclose information about the bitcoin investments.   Following a January 12, 2018 hearing the court ordered Francis to immediately transfer to Erica half of the 613.53 bitcoins and associated bitcoin cash and gold he had in his possession, to show cause why he should not be ordered to transfer an additional 224.34 bitcoins and proportional cryptocurrency, and to pay Erica's attorney's fees and costs pursuant to Family Code sections 721 and 1100.  It is undisputed that Francis transferred 306.765 bitcoins to Erica in order to comply with the first part of the court's order.

Erica's request for order was tried over four days between June and August 2018.  On October 19 the court issued its final

_____

[4] Apparently a "forking" event in August 2017 added 50.205 bitcoins to the bitcoins Wences purchased for Francis, resulting in the 613.53 figure he reported in December 2017.

6

statement of decision finding that Francis committed a series of transgressions surrounding his purchase and handling of the bitcoins. The court found Francis violated the automatic restraining order and his fiduciary duties when, without Erica's knowledge or agreement, he sent $45,000 to Mt. Gox to purchase bitcoins, committed additional community funds so that Wences and Khaled could purchase bitcoins on his behalf, and moved the Wences bitcoins between bitcoin wallets. The court further found that while Francis possessed documentation of the proxy purchases since April 2013, he "not only refused to disclose, but affirmatively hid from [Erica] their involvement until February 9, 2018."

In addition to concealing his bitcoin purchases and use of proxies, Francis's failure to inform Erica about the Mt. Gox bankruptcy further breached his fiduciary duty. "This was a material fact he should have disclosed to [Erica]. Had he disclosed these important facts [Erica] would have had the ability to object to a division in kind of the bitcoins and/or protect her interest in the bitcoins by requesting the Court to use its equitable powers to protect her from [Francis's] decision to purchase the bitcoins as he did which tied up a substantial portion in bankruptcy." Francis again breached his fiduciary duty when he failed to list the $45,000 sent to Mt. Gox in either of his declarations of disclosure, failed to file a bankruptcy claim for those funds, withheld information about his bitcoin investments during discovery, failed to produce and falsely

denied having documentation related to the bitcoins, and failed to disclose the cryptocurrency generated by forks.

The court ordered Francis to transfer $22,500 in cash and 249.445 additional bitcoins to Erica, along with the corresponding bitcoin gold and bitcoin cash. Francis was also ordered to pay Erica's attorneys' fees and costs incurred in bringing her motion.

Francis filed a timely appeal after the court denied his new trial motion.

## DISCUSSION

### I. Legal Principles

Family Code section 721[5] "recognizes the confidential relationship held by spouses. That relationship is a fiduciary

---

[5] With exceptions not relevant here, subdivision (b) of Family Code, section 721 provides that "in transactions between themselves, spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to, the following:

(1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.¶ (2) Rendering upon request, true and full information of all things affecting any transaction that concerns the community property. Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions. ¶(3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived

8

relationship 'impos[ing] a duty of the highest good faith and fair dealing on each spouse[.]' [Citation.] Also within that division, section 1100 addresses management and control of community property. Subdivision (e) of section 1100 provides: 'Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court. This duty includes the obligation to make full disclosure to the other spouse of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community is or may be liable, and to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request.'" (*In re Schleich* (2017) 8 Cal.App.5th 267, 276-277 (*Schleich*).)

This fiduciary duty continues after separation, including "the accurate and complete disclosure of all assets and liabilities in which the party has or may have an interest or obligation and all current earnings, accumulations, and expenses, including an immediate, full, and accurate update or augmentation to the extent there have been material changes." (§ 2012, subd. (a)(1).)

from any transaction by one spouse without the consent of the other spouse that concerns the community property.

Further statutory citations are to the Family Code.

"Taken together, these Family Code provisions impose on a managing spouse affirmative, wide-ranging duties to disclose and account for the existence, valuation, and disposition of all community assets from the date of separation through final division. These statutes obligate a managing spouse to disclose soon after separation all the property that belongs or might belong to the community, and its value, and then to account for the management of that property, revealing any material changes in the community estate, such as the transfer or loss of assets. This strict transparency both discourages unfair dealing and empowers the nonmanaging spouse to remedy any breach of fiduciary duty by giving that spouse the 'information concerning the [community's] business' needed for the exercise of his or her rights [citation], including the right to pursue a claim for 'impairment to' his or her interest in the community estate [citation]." (*In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1270-1271 (*Margulis*).)

Section 1101 thus affords each spouse a claim against the other for any breach of fiduciary duty that results in an impairment to his or her interest in the community estate, "including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact" to the claimant spouse's interest in the community estate. (§1101, subd. (a).) Remedies for a breach of this duty that impairs another spouse's interest in the community estate include "an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any

10

asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs." (§1101, subs. (a), (g).)

Our courts have varied in stating the standard of review that applies when the trier of fact has found a breach of this duty. (See *In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144 (*Kamgar*) [substantial evidence]; *Schleich, supra,* 8 Cal.App.5th at pp. 283-284 [abuse of discretion].) The difference in approach does not matter here. "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be, or deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.' " (*In re Marriage of Goodwin-Mitchell & Mitchell* (2019) 40 Cal.App.5th 232, 238-239.)

11

## II. Materiality

As noted in *Schleich, supra,* 8 Cal.App.5th at pp. 276-277, subdivision (e) of section 1100 requires each spouse to fully disclose all material facts regarding community assets. Francis argues his failure to fully inform Erica about the bitcoin investments was not "material" within the meaning of this provision because "no evidence suggested Erica's knowledge of this information would have affected her decision-making in the least." The court's contrary finding is supported by substantial evidence and within its discretion.

The court found the suspension and bankruptcy of Mt. Gox less than a year after Francis used community funds and proxies to purchase bitcoins from the exchange "substantially impaired [Erica's] undivided one-half interest in the community Bitcoin estate. She was unable to sell or transfer a substantial portion of her bitcoins. The purchase made by Wences was previously transferred to [Francis's] blockchain wallet but Khaled's purchase and the $45,000 deposit by [Francis] are subject to the bankruptcy and are inaccessible and if [Erica] were ever to receive some or all of her bitcoins or the cash it most likely will be at a significant loss, or even turn out to be worthless." The court further found that Francis's 2014 and 2015 declarations of disclosure listed the total amount of his bitcoin purchases, but failed to disclose that 498 of those 1062.21 bitcoins were (1) purchased by and still in Khaled's nominal possession; and (2) tied up in the Mt. Gox bankruptcy. These facts, the court found, were material. "Had he disclosed these important facts [Erica]

12

would have had the ability to object to a division in kind of the [total] bitcoins and/or protect her interest in the bitcoins by requesting the Court use its equitable powers to protect her from [Francis's] unilateral decision to purchase the bitcoins."

Francis asserts the evidence that Erica generally took no interest in the couple's finances during or after their marriage proved that she would not have done anything to protect her interest in the bitcoin investments had he informed her about them. The trial court reasonably disagreed. Erica's lack of involvement or interest in the couple's finances before they separated is undisputed, but it sheds little if any light on what she would do to protect her financial interests after retaining divorce counsel, filing for divorce, and serving Francis with restraining orders that barred him from making unilateral decisions involving the community estate. Even Francis acknowledges in his reply brief the "general validity" of Erica's point that " [a] spouse who may be reliant on and trusting of the other during marriage, may well exercise independent judgment and rely on new advisors after separation. Indeed.

Nor did Francis's evidence compel the court to accept his view that Erica "continued her indifference to issues surrounding the community's investments" after the parties separated. His support for this characterization consists of his own conclusory testimony to that effect and one post-separation incident in which Erica agreed to his request to invest $50,000 of community funds in a friend's company. None of this, plainly, compels a finding that Erica would have done nothing throughout years of

13

divorce litigation to preserve her interest in an investment that was worth millions of dollars by the time the property judgment issued.

Francis more specifically asserts that his failure to disclose his initial purchase of bitcoins is immaterial because "the court did not base its Family Code section 1101, subdivision (g) award on a finding that Francis had breached his fiduciary duty by failing to disclose his investment to Erica beforehand, or for that matter by keeping the Khaled bitcoins at Mt. Gox or by employing proxies to purchase bitcoins." Rather, he maintains, the findings of breach "[a]t most" "related to [his] failure to tell Erica at various times *well after* he purchased the bitcoins about his use of proxies and the Mt. Gox bankruptcy." Not so. The court expressly (and nonexclusively) found that Francis "breached his fiduciary duties to [Erica] *when he purchased the bitcoins in 2013. . . .*" (Italics added.) And it found the Mt. Gox suspension and bankruptcy "substantially impaired" Erica's interest in the Khaled bitcoins by rendering them inaccessible and potentially worthless. "[T]hese facts were clearly 'material' information that should have been made known" to her. Francis's distortion of the court's express findings does not help him.

Neither does his suggestion he cannot be faulted for failing to disclose the Mt. Gox bankruptcy because, although he received a notice of bankruptcy in May 2014, he testified that he was unaware the Khaled bitcoins were caught up in it before Khaled told him in December 2017. The trial court expressly disbelieved

14

this testimony. "Given the fact that Khaled testified that he worked with [Francis's] brother for a period of at least ten years and had not only socialized with Francis, but had traveled with him too, it is more likely than not that [Francis] knew of the loss of bitcoins to bankruptcy earlier than December 2017." We will not second guess the court's credibility assessment. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.)

The court's finding that Francis failed to disclose material information about his bitcoin investments is supported by substantial evidence and within its broad discretion.

### III. Impairment

Francis argues that, even if he failed to disclose material information, his disclosure caused no impairment to Erica's community interest because, even with the Khaled bitcoins tied up in the Mt. Gox bankruptcy, the Wences bitcoins "earned millions of dollars for the community, thereby greatly enriching, not impairing, the community estate." Again, the trial court reasonably disagreed. True, the bitcoins Wences purchased for Francis and moved out of Mt. Gox before the bankruptcy grew from an initial value of roughly $100,000 to around $3.45 million by August 2018.[6] But the financial success of one undisclosed investment does not erase the harm to the community estate, and Erica, occasioned by a separate undisclosed transaction.

*In re Marriage of Feldman* (2007) 153 Cal.App.4th 1470, 1483 (*Feldman*) is instructive. There, a husband contended his

---

[6] Francis does not dispute his liability to the community for the initial $45,000 wired to Mt. Gox.

failure to include a $1 million bond in his financial disclosures in violation of section 2102, subdivision (a)(1) was excused by his failure to include the corresponding debt he incurred to finance the bond's purchase. The contention was unavailing. As the appellate court observed, "[t]he statutory policy in favor of disclosure contains no exception for debts and assets that offset each other, and [Husband] has cited no authority to support such a position." (*Ibid.*) So too here. Francis attempts to distinguish *Feldman* on the ground it addresses sanctions for failures to comply with financial disclosure obligations under section 2102 rather than spousal liability for fiduciary breaches more generally, but the distinction is immaterial. As observed in *Margulis, supra,* 198 Cal.App.4th at p. 1270, section 2102, together with sections 721, 1100 and 1101, is part of the integrated statutory scheme that implements the policy of fiduciary care by imposing "wide-ranging duties to disclose and account for the existence, valuation, and disposition of all community assets from the date of separation through final division." (*Ibid.*) The statutory policy at issue in *Feldman,* therefore, is equally compelling here. Alternatively, Francis insists the Khaled and Wences' bitcoins were merely two facets of one unitary investment and, therefore, he cannot be penalized for one and not credited for the other. But the trial reasonably court drew a different inference from the evidence, so we will not disturb it.

Lastly, Francis's contention that his nondisclosures did not *cause* the bankruptcy and resulting devaluation of the Khaled

16

bitcoins largely rests on and reiterates his argument that the nondisclosures were immaterial. Accordingly, it fails for the same reasons.  In any event, nothing in the trial court's order suggests its findings are premised on such an unlikely surmise.

## DISPOSITION

The order is affirmed.

_____
Siggins, P.J.

WE CONCUR:


_____
Fujisaki, J.


_____
Petrou, J.

*DeSouza v. DeSouza*, A156311

18

Filed 8/26/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of ERICA and FRANCIS DESOUZA. | A156311 |
| ERICA DESOUZA,<br><br>      Respondent,<br><br>v.<br><br>FRANCIS DESOUZA,<br><br>      Appellant. | (City & County of San Francisco<br>Super. Ct. No.<br>FDI12778498) |

BY THE COURT:

The opinion in the above-entitled matter filed on August 10, 2020, was not certified for publication in the Official Reports. For good cause, the request for publication filed August 26, 2020 is granted.

Pursuant to California Rules of Court, rules 8.1120 and 8.1105(c)(2), the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.

Dated: _____ _____P.J.

Trial Court:        San Francisco County

Trial Judge:        Hon. Richard C. Berra

Attorneys:          Philip S. Silvestry, Gregory R. Ellis for Appellant.

                    Samantha Bley DeJean, Juliana Yanez, Robert A. Olson,
                    Eleanor S. Ruth for Respondent.