Filed 10/4/24  Marriage of DeBenedetti and Ensberg CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of CHRISTINA DeBENEDETTI and MORGAN ENSBERG. | D081607 |
| CHRISTINA DeBENEDETTI, | |
| Respondent, | (Super. Ct. No. 17FL000014N) |
| v. | |
| MORGAN ENSBERG, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Christine K. Goldsmith, Judge (Ret.).  Affirmed.

Bickford Blado & Botros and Andrew J. Botros for Appellant.

Dick& Wagner and Stephen J. Wagner;  Complex Appellate Litigation Group, Gregory R. Ellis and Kelly A. Woodruff for Respondent.

Morgan Ensberg (Morgan) appeals from a judgment in favor of his former wife, Christina DeBenedetti (Christi).[1] The trial court found Morgan breached his fiduciary duty to Christi, including by failing to disclose how he spent and invested community funds during their marriage, and by not accounting for such funds after the couple separated. The court awarded Christi $1,831,250, which equaled her share of community funds that "simply vanished" while under Morgan's management and control; and $100,000 in attorney fees and costs as a sanction for his breaches of fiduciary duty.[2] (Fam. Code, § 1101, subd. (g).)[3]

On appeal, Morgan contends (1) Christi waived her breach of fiduciary duty claim based on a general release she signed in a "civil settlement" involving In His Grip JM, LLC (IHG), the partially community-owned company that Morgan managed; (2) there is a lack of substantial evidence he engaged in intentional, reckless, or grossly negligent conduct as managing spouse of the community estate; (3) Christi "ambushed" him at trial with a new theory of recovery based on his failure to account for community assets under his management and control; and (4) the $100,000 sanctions award cannot stand because the court failed to find Morgan had an ability to pay, as required by section 1101, subdivision (g).

---

[1] As is traditional in family law cases, for clarity we refer to the parties by their first names. No disrespect is intended. (See *In re Marriage of Loyd* (2003) 106 Cal.App.4th 754, 756 fn. 1.)

[2] The trial court also assigned Morgan the 2015 and 2016 community tax debt and penalties; and awarded Christi $130,000 in sanctions due to Morgan's "evasive" discovery answers. (Code Civ. Proc., §§ 2033.220 & 2033.420.) Morgan does not challenge this portion of the judgment.

[3] All further undesignated statutory references are to the Family Code.

As we explain, we conclude the general release signed by Christi is not relevant here because her damage award was based on Morgan's breach of fiduciary duty in failing to disclose and account for how he spent millions of dollars of community funds, not as a result of his admitted mismanagement of IHG which included embezzling funds from it; ample evidence supports the trial court's finding that his conduct was intentional, reckless, or grossly negligent in managing the community estate, in which millions of dollars in assets disappeared; Christi did not "ambush" Morgan at trial with a new theory of recovery, as it was his burden as managing spouse to prove what happened to the missing assets, a burden he admittedly could not meet; and the $100,000 sanctions award was proper because subdivision (g) of section 1101 requires such an award as part of the statutory remedies for a spouse's breach of fiduciary duty, and Morgan did not oppose this award in his objections to the court's proposed statement of decision (proposed SOD). Therefore, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Overview*

Christi and Morgan married in September 2000 and separated in October 2016. They are the parents of three children. Christi filed a petition for dissolution of marriage in January 2017. The trial court entered a status only judgment of dissolution in January 2019, leaving for trial a variety of other issues.

In May 2022, the parties participated in a seven-day trial. Relevant to this appeal are issues of Morgan's alleged breaches of his fiduciary duty to Christi; liability for federal and state taxes and penalties owed by the community due to Morgan's management of the parties' finances, Morgan's embezzlement of funds from IHG; and sanctions sought by Christi against

3

him.  The trial court issued a proposed SOD in July 2022, and issued a final SOD in December 2022, after Morgan's timely objections.  The court entered judgment on reserved issues in December 2022.

**B.** *Management of the Community Finances*

During the parties' marriage, Morgan became a professional baseball player.  His total earnings received between 2002 and 2008, came to over $11 million.  His Major League Baseball career ended in the spring of 2009.  Morgan felt relief when he stopped playing professionally due to the pressure it put on him but became "nervous" about his transition away from baseball.

Over the entirety of their 16-year marriage, Morgan was "secretive" about the parties' finances, including "financial decisions, his finances, [and] his bank accounts."  Christi "constantly" asked Morgan to share their "financial standing and what was going on financially," but he always refused to provide that information, leaving her feeling "in the dark."

Morgan limited Christi's financial responsibility to the community to paying the household bills out of a joint account they opened shortly after marriage.  During Morgan's highest earning years playing baseball, Christi made about $2,000 a month, which she deposited into the joint account, Morgan also deposited his baseball salary into the shared account.  About "every other month," Morgan wired "large chunks of money" from that account into brokerage accounts to which he alone had access, one of which Christi only learned about after they had separated.  Morgan, however, did not "permit[]" Christi to make wire transfers from that account or use community funds to make her own investments.

Christi knew about Morgan's wire transfers and repeatedly asked what he was doing with their money.  He told her, " 'I'm investing it.' "  When she inquired further, he responded he was investing in the stock market and

4

ignored her repeated requests to be part of the decision-making regarding how their money should be invested. Morgan explained to Christi that she "wasn't intelligent enough" to help with those financial decisions.

## C. *IHG*

In 2013, Morgan founded IHG, with the plan to become a franchise owner in Jersey Mike's, a sandwich shop. Before 2013, Morgan had volunteered as an assistant baseball coach at a local university, and occasionally appeared as a commentator on various sports networks.

Morgan first learned of the opportunity to become a franchise owner in Jersey Mike's after the family moved to Solana Beach. Morgan met with corporate representatives, who offered him the opportunity to open three stores in the Oceanside area. Morgan signed three franchise agreements with Jersey Mike's. The agreements required Christi's signature also. Although Morgan knew it was wrong, he forged Christi's signature on the agreements "out of convenience" and without her permission. Morgan used money from a community retirement account to open the first store in 2013; and convinced close friends, including two former teammates, to invest in IHG and launch the other two Jersey Mike's in 2014 and 2015. Christi and Morgan ended up with a 56 percent ownership interest in IHG, which then owned three stores managed by Morgan.

With additional investors and three stores, ownership of IHG was transferred to an LLC. Morgan and the partners signed an operating agreement. Morgan also signed Christi's name on the operating agreement without her knowledge, again merely for "convenience."

Months after signing the operating agreement, Morgan accepted $65,000 from another friend and former teammate, who wanted to invest in IHG. Morgan did not inform Christi or the other partners about this new

5

investor; and, instead of getting the former teammate to execute the operating agreement, Morgan had him sign a contract Morgan created as "proof that [this investor] had put money into the business." Morgan later "regret[ted]" not telling Christi and his partners about this new investor.

Morgan and the partners subsequently acquired three more Jersey Mike's franchises in Carlsbad and Encinitas, which were also operated through IHG and managed by Morgan. Morgan initially paid himself a salary to manage IHG based "sort of [on] the amount of money [IHG] . . . made in the business." In 2015, IHG officially set Morgan's salary at $120,000 a year.

## D. *Morgan's Unauthorized Distributions and Other Wrongdoings*

Morgan knew his IHG salary was insufficient to support his family, given their substantial expenses including from the remodel of the family house. Morgan began taking "distributions" from IHG beyond his agreed salary, paying himself about $15,000 a month, plus additional sums "as the need arose." In total, Morgan started collecting a total annual salary between $240,000 and $250,000. Morgan's embezzlement of funds from IHG came to light in October 2016, when IHG was unable to make a $70,000 payroll tax. Morgan contacted his partners and inquired whether they would be willing to contribute additional capital to the business. They refused and grew concerned because the profit and loss statements of IHG showed on paper the business had sufficient funds to pay the tax.

On October 26, 2016, while on a conference call which included an accountant and an attorney for one of the partners, Christi learned for the first time that Morgan had embezzled money from the business. Prior to this call, Morgan had never provided Christi with "a single balance sheet or

6

[profit and loss] or bank statement or operating agreement or franchise agreement or any documents" regarding IHG.

During the call, Christi also learned that Morgan had done "lots of [other] illegal things" including "taking cash out of the ATM"; "using the company ATM Visa for his own personal use"; "leasing a car on the business without the business partners' consent"; and taking "a loan out from the seller of his most recent acquisition without the partners' consent." They estimated Morgan owed IHG at least $1 million. Thereafter, Christi worked for weeks with the other partners to "unravel" the various transactions by Morgan.

After the October 26 call, Christi discovered that for the last three years Morgan had not paid administrative fees on a community owned retirement account, leading to the early distribution of that money and resulting tax liability and penalties to the community. About five days after the October 26 conference call, Christi and Morgan separated.

In October 2017, as a result of "Morgan's improper use of business funds, . . . [his] entering into the loan agreements and improper use of loan funds, his failure to pay payroll taxes and business taxes, and his several forgeries of Christi's name on documents," he and Christi entered into a "civil settlement" with the other IHG partners. This settlement required Christi and Morgan to divest their entire ownership interest in IHG. Morgan also stepped down as manager of IHG, assumed responsibility for various debts he caused the business, and IHG and the other partners agreed to hold Christi harmless from any additional liabilities incurred by the business or the partners.

Before the IHG settlement agreement, Christi and Morgan entered into a written stipulation regarding the marital residence and Christi's interest in

7

IHG. Their agreement provided that, in return for Christi's transfer to Morgan of her 28 percent share in IHG, she would receive the community property marital home (along with the debt secured by it) as her separate property; that this "partial pre-distribution [would] not impact any other division or equalization of the balance of the marital estate"; and that enforcement of the stipulation depended on the execution of the settlement agreement by IHG and the other partners.

## E. *The SOD and the Resulting Judgment*

### 1. Management of IHG

Based on the above evidence, the trial court in its SOD found that Morgan "himself has acknowledged most, if not all" the "inappropriate transactions" he undertook while managing IHG, including taking more cash from the business than he was entitled to; forging Christi's signature on many business documents; gifting 5 percent of the community's interest in IHG to his brother without Christi's knowledge; bringing another partner into the business without amending the operating agreement; running personal expenses through the business; and using IHG assets to "personally" invest in the stock market. Morgan also admitted "hid[ing] these activities" from Christi and the other IHG partners because "he knew they would not approve." The court found Morgan's conduct in the "handling of [IHG] was grossly negligent, reckless, and constituted intentional misconduct."

The trial court found the value of IHG was not "well-documented"; that an accountant for one of the partners reviewed various records, "whose veracity he did not know," and estimated the entire business was worth between $2.5 and $3 million. Further, the court concluded that because Christi and Morgan owned a 56 percent interest in IHG, when they separated the community's interest in the business was about $1.4 million, "not

8

accounting for the array of debts that the partners ultimately discovered Morgan owed to them."

## 2. Failure to Pay Taxes

The trial court found Morgan also caused the community to "suffer serious tax consequences and penalties" when, as manager of IHG, he withdrew money from a community retirement account to invest in additional Jersey Mike's franchises. The court also found that Morgan failed to pay the 2015 and 2016 administrative fees to maintain another community retirement account, resulting in additional tax liabilities and penalties for the community.

The trial court further found that some of the community tax liability for 2015 and 2016 was the result of Morgan's "additional 'draws' (embezzlement) from the community business." The court noted that for tax years 2015 and 2016, Christi "secured an 'Innocent Spouse' exemption from the IRS and FTB" because she was unaware of Morgan's wrongdoing. The court determined that due to Morgan's "fraudulent[] misappropriate[ion]" of money belonging to IHG, he alone was "responsible for the consequences," including the tax debt and resulting penalties.

## 3. Large Cash Expenditures During Marriage

Since the community was missing millions of dollars in resources, presumably by Morgan's asset mismanagement, Christi asked the court to "infer intentional breaches of fiduciary duty to the community." Christi further asked the court to make "findings as to the parties' average monthly expenditures, and subtract[] those sums from the estimated earnings over a period of years when Morgan was at his highest earning potential." Because the court found the parties "were left with nothing or next to nothing" at the time of the October 2016 phone call, Christi asserted these computations

9

were her measure of damages. Morgan, however, argued these damages were too speculative to be recoverable. The court agreed with Christi and awarded her $1,831,250, equal to half the value of the community assets that went missing under his management and control.

## DISCUSSION

### A. *Statutory Framework*

Section 1100, subdivision (a) provides in part: "[E]ither spouse has the management and control of the community personal property, . . . with like absolute power of disposition, other than testamentary, as the spouse has of the separate estate of the spouse." In turn, section 1100, subdivision (e) provides: "Each spouse shall act with respect to the other spouse in the management and control of the community assets and liabilities in accordance with the general rules governing fiduciary relationships which control the actions of persons having relationships of personal confidence as specified in Section 721, until such time as the assets and liabilities have been divided by the parties or by a court."

With exceptions not applicable here, section 721, subdivision (b) imposes "a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other. This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code . . . ."

Section 721's incorporation of the "same rights and duties of nonmarital partners" described in section 16403 of the Corporations Code, "makes clear that the duty to disclose relevant information concerning transactions affecting the community property is an affirmative and broad obligation." (*In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th

1252, 1269 (*Margulis*), quoting Corp. Code, § 16403, subd. (c) [requiring each partner to "furnish to a partner . . . [¶] (1) Without demand, any information concerning the partnership's business and affairs reasonably required for the proper exercise of the partner's rights and duties under the partnership agreement or this chapter; and [¶] (2) On demand, any other information concerning the partnership's business and affairs, except to the extent the demand or the information demanded is unreasonable or otherwise improper under the circumstances"].)

Section 16404 of the Corporations Code, also referenced by Family Code section 721, subdivision (b), states that a partner owes to the partnership and the other partners the "duty of loyalty and the duty of care." (Corp. Code, § 16404, subd. (a).) As relevant here, the duty of loyalty requires a partner to "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct . . . of the partnership business or derived from a use by the partner of partnership property or information" (*id.*, subd. (b)(1)); and to "refrain from dealing with the partnership in the conduct . . . of the partnership business as or on behalf of a party having an interest adverse to the partnership" (*id.*, subd. (b)(2)). The duty of care requires a partner to "refrain[] from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law." (*Id.*, subd. (c).)

The Family Code explains that "[a] spouse has a claim against the other spouse for any breach of the fiduciary duty that results in impairment to the claimant spouse's present undivided one-half interest in the community estate, including, but not limited to, a single transaction or a pattern or series of transactions, which transaction or transactions have caused or will cause a detrimental impact to the claimant spouse's undivided

11

one-half interest in the community estate." (§ 1101, subd. (a).) The remedies for a breach "shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty plus attorney's fees and court costs." (§ 1101, subd. (g).) And, under subdivision (h), that award increases to 100 percent of such assets if the breach falls within the ambit of Civil Code section 3294 (§ 1101, subd. (h)).

## B. *Standards of Review*

"The existence and scope of a fiduciary duty is a question of law that we review de novo. (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.) However, 'the factual background against which we [answer that question] is a function of a particular case's procedural posture.' (*Id.* at p. 1214.) Thus, to the extent the court's decision below 'turned on the resolution of conflicts in the evidence or on factual inferences to be drawn from the evidence, we consider the evidence in the light most favorable to the trial court's ruling and review the trial court's factual determinations under the substantial evidence standard. [Citation.]' [Citation.] Where there is a fiduciary duty, breach of the duty is a question of fact. [Citation.] We review the trier of fact's finding a breach occurred for substantial evidence, resolving all conflicts and drawing all reasonable inferences in favor of the decision." (*In re Marriage of Kamgar* (2017) 18 Cal.App.5th 136, 144 (*Kamgar*).)

## C. *The "Spousal Release and Consent" Agreement Does Not Bar Christi's Recovery*

Morgan's primary contention on appeal is that Christi was barred from recovering her share of the community interest in IHG at the time of separation. The trial court found the community's interest in IHG "was, conservatively, $1,400,000." The trial court based its value estimate on

12

testimony from an accountant who reviewed the unverified documents from IHG. The accountant gave a range of possible values assigned to the couple's share of the business, with $1.4 million being the lowest valuation.

As relevant here, the settlement provided that Christi "releases and forever discharges Morgan, [the other investors of IHG,] and [IHG] . . . from any and all claims, debts, liabilities, and causes of action of any nature, character or description, known or unknown, latent or patent, which the undersigned have held, now hold or may hold in the future against the Released Persons [as defined] relating to the Jersey Mike's franchises" described in the IHG settlement agreement.

Christi counters that the release issue is irrelevant because the trial court did not award her any damages due to Morgan's mismanagement of IHG, which was the subject of the Spousal Consent and Release and the IHG settlement agreement. Instead, she contends the court merely *estimated* the value of the community interest in IHG at the time of separation, without regard to the "array" of debts Morgan owed IHG and/or the partners. We agree with Christi.

We read the trial court's opinion not as assigning Christi money based on her community share of IHG. Rather the trial court recited how much money Morgan lost to describe the scale of his breach of fiduciary duty to Christi and the community. Indeed, the judgment entered on December 22, 2022, specifically states that Christi is awarded $1,831,250 in "damages for her undivided one-half share of the *unaccounted monies* over which Respondent [Morgan] exercised management and control." (Italics added.) Not surprisingly, Morgan in his reply brief agrees with Christi's assertion "that he does not owe [her] this additional $1.4 million" or any part of it. Instead, Morgan asserts that we should consider the release for the "limited

13

purpose of addressing Christi[]'s argument that the trial court's $1,831,250 fiduciary duty award consists of breaches *related to* Jersey Mike's." (Italics added.)

But the trial court's damage award was not "related to" Morgan's breach of fiduciary duty in managing the IHG business. Rather, the court tied its decision to the sheer scale of Morgan's failure to both disclose to Christi how he spent community funds, and his inability to account for funds over which he exercised exclusive management and control. Given the underpinning to the trial court's approach, it is unnecessary for us to decide whether the Spousal Consent and Release Christi signed in the IHG "civil settlement" barred her recovery in the current dissolution action. That's because the issue here is Morgan's breach of his fiduciary duty to Christi which does not implicate the Spousal Consent and Release.

Our conclusion also resolves Morgan's other contentions about the trial court erring when "it failed to consider 'the value of the marital residence' *given*" to Christi, and the " '$680,000 in excess compensation *received* from IHG,' " when it purportedly awarded Christi $1.4 million for "Morgan's breach *related to* IHG." (Italics added.) However, because the court's award of damages to Christi was unrelated to Morgan's management of IHG, these additional arguments are unpersuasive.

In any event, the undisputed evidence shows Christi's receipt of the marital home was in consideration for her giving up a 28 percent interest in IHG, per the parties' written stipulation. There is no evidence Christi was "given" the martial home as part of the dissolution proceeding, nor has Morgan cited us to any. (See Cal. Rules of Court, rule 8.204(a)(1)[4] [a brief

---

[4] All further rule references are to the California Rules of Court.

14

must "(C) Support any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."].)

In addition, the trial court found Christi "enjoyed the benefit" of money that Morgan embezzled from IHG, since it was "used to pay household bills and to support the family's lifestyle."  However, the trial court also found Christi did not know the "source" of those additional funds and she "did not participate in the embezzlement."

These findings, Morgan leaves unchallenged on appeal.  They are also amply supported by the record (see *Kamgar*, *supra*, 18 Cal.App.5th at p. 144).  Therefore, we reject Morgan's claims the trial court erred either by refusing to offset Christi's damage award with the value of the family home Christi acquired through the parties' stipulation, or with half the money Morgan stole from the business without her knowledge and consent.

## D. *Substantial Evidence Supports the Finding Morgan Breached His Fiduciary Duties to Christi*

Morgan next contends the trial court abused its discretion when it found he breached his fiduciary duty because of his inability to account for community funds after separation.  He bases this contention on the court's comment in the SOD that he "exhibited, at best, a very casual and disengaged attitude toward the management of the parties' financial affairs and, at worst, a grossly negligent and reckless handling of their investments and money."[5]  According to Morgan, this comment suggested the court was unable to make a finding his conduct amounted to a breach of fiduciary duty.  We are not persuaded.

---

[5]     The trial court overruled Morgan's objection to this finding in the proposed SOD.

## 1. Morgan Engaged in Intentional, Reckless, and Grossly Negligent Financial Conduct as Managing Spouse

Contrary to Morgan's contention, the trial court in its SOD found that Morgan engaged in "intentional and reckless, as well as grossly negligent" conduct in breaching his fiduciary duties to Christi. The court wrote it found "that Morgan breached his fiduciary duty to Christi and the community by mismanaging the [IHG] business; by mismanaging the parties' retirement funds, resulting in early distributions causing taxes and penalties; by failing to keep Christi informed of the parties finances and investments, even when asked; [and] by mismanaging large sums of money from his salary during his years as a Major League player. There is no defense to these activities. There is no laches. Christi acted as soon as she knew of these actions by Morgan, all of which were *intentional and reckless, as well as grossly negligent*. Christi's interest in her share of the parties' community property estate was *severely hampered* by Morgan's breaches. . . . Christi's retirement assets are virtually nil. Millions in cash has been squandered." (Italics added.)

Thus, the record belies Morgan's contention that the trial court could not, and therefore did not, determine whether his conduct amounted to a breach of fiduciary duty, based on his intentional, reckless, and grossly negligent management of the community estate.

## 2. Morgan Breached His Duty of Disclosure

In addition, the above summary shows the trial court also found that Morgan breached his fiduciary duty to Christi by failing to keep her informed of the parties' finances, even when asked. The decision in *Kamgar*, *supra*, 18 Cal.App.5th 136 provides meaningful guidance regarding the duty of disclosure between spouses.

In *Kamgar*, the husband claimed the evidence did not support the trial court's finding that he breached his fiduciary duty to his former wife, when he failed to disclose that he had risked millions more community assets than the $2.5 million she had agreed he could trade in the stock market. (*Kamgar*, *supra*, 18 Cal.App.5th at p. 139.) Not unlike Christi in the instant case, the wife in *Kamgar* trusted her husband with the "basic management and control of the finances." (*Ibid.*) During their last five years of marriage, he made investment decisions for the family, only some of which he discussed with his wife. (*Id.* at p. 140.) He also had not shown his wife bank statements and financial documents for many years, after he rented an office away from home. (*Ibid.*)

At some point, the husband began options trading. He opened a self-directed trading account, and with his wife's consent, deposited $2.5 million into that account, or about 25 percent of the parties' net worth. (*Kamgar*, *supra*, 18 Cal.App.5th at p. 140.) To increase the potential return in options trading, with the concomitant risk of loss, he had to pass a test demonstrating his financial knowledge and awareness of trading risks. (*Id.* at p. 140.) The husband took the test for himself and, unknown to his wife, for her as well, signing her name on the application verifying she had "extensive options trading experience." (*Id.* at pp. 140–141.)

Over the next year and without his wife's knowledge, he deposited additional community funds into this trading account, for a total community investment of more than $10.5 million. (*Kamgar*, *supra*, 18 Cal.App.5th at p. 141.) The husband's account at one point peaked above $19 million, then suffered catastrophic losses, leaving only about $410,000 in that account. (*Ibid.*)

17

The trial court ruled the husband breached his fiduciary duty to his wife by "failing to disclose the 'series of investment transactions made by him'" (*Kamgar*, *supra*, 18 Cal.App.5th at p. 143); and by "grossly negligent mismanagement of the parties' assets in the trading account" (*ibid.*). The court awarded her about $1.95 million, "as her share of community funds lost in [the husband's] undisclosed and reckless trading." (*Ibid.*)

In affirming the trial court's award, the *Kamgar* court concluded that, because " ' "each spouse has equal management and control rights, . . . they must provide the other "without demand, any information concerning" the management and control of the community property," ' " and that their failure to do so is a breach of fiduciary duty. (*Kamgar*, *supra*, 18 Cal.App.5th at p. 146, quoting Cal. Family Law Practice & Procedure (Matthew Bender 2d ed. 2014), § 24.11; accord, *Margulis*, *supra*, 198 Cal.App.4th at p. 1269 [the duty to disclose relevant information affecting community property "is an affirmative and broad obligation"].)

The *Kamgar* court agreed with the trial court that the husband "breached his fiduciary duty of disclosure when he unilaterally decided to put at risk and lose in options trading a sum *beyond the amount* [his wife] *agreed to risk*" (i.e., $2.5 million). (*Kamgar*, *supra*, 18 Cal.App.5th at p. 147.) The *Kamgar* court concluded that in "unilaterally deciding to risk the additional $8,188,605 in community funds, which was virtually all of the couple's liquid net worth, [the husband] interfered with [his wife's] equal right of management and control over those funds (§ 1100, subd. (a)). . . . Absent disclosure, he thwarted [the wife's] 'proper exercise of [her] rights and duties'

18

as a partner concerning those assets ([Corp. Code,] § 16403, subd. (c)(1)).” (*Kamgar*, at p. 148.)[6]

Turning to the instant case, substantial evidence supports the trial court’s finding that Morgan breached his fiduciary duty to Christi under sections 721 and 1100 by failing, *inter alia*, to “[r]ender[] upon request, true and full information of all things affecting any transaction that concerns the community property” (§ 721, subd. (b)(2)); “to make full disclosure . . . of all material facts and information regarding the existence, characterization, and valuation of all assets in which the community has or may have an interest and debts for which the community may be liable” (§ 1100, subd. (e)); and “to provide equal access to all information, records, and books that pertain to the value and character of those assets and debts, upon request.” (*Ibid.*; *Kamgar*, *supra*, 18 Cal.App.5th at p. 148.)

Indeed, during the entirety of their 16-year marriage, Morgan was “secretive” about the parties’ finances, leaving Christi “in the dark” when it came to the investments he was making, the couple’s overall “financial standing,” and what he was doing with “large chunks of money” he wired from their joint account into various accounts *only* he had knowledge of and could access. And, when pressed by Christi regarding his management and control of community finances including his investment of community funds, Morgan would usually give one of two responses. Either Morgan ignored Christi or he belittled her by telling her she would not understand their finances because she “wasn’t intelligent enough.”

---

[6] Because the *Kamgar* court held the husband breached his duty of disclosure, it declined to decide whether substantial evidence supported the trial court’s finding that he also breached his fiduciary duty “by engaging in grossly negligent and reckless behavior” in options trading of community funds. (*Kamgar*, *supra*, 18 Cal.App.5th at p. 148.)

Like the husband in *Kamgar*, there is substantial evidence here that Morgan deprived his spouse of "true and full information of all things affecting" the community estate (see § 721, subd. (b)(2)); failed to disclose, much less "full[ly] disclose . . . all material facts and information" regarding their estate, including how he was investing community funds and the status of those investments (see § 1100, subd. (e)); and prevented her from having "equal access to all information, records, and books" pertaining to the value and character of the estate, including its assets and debts (*ibid.*). This evidence supports the trial court's finding that Morgan breached his duty of disclosure to Christi, depriving her of "equal right of management and control" of the community estate. (See *Kamgar*, *supra*, 18 Cal.App.5th at p. 148.)

### 3. Morgan Breached His Duty of Accountability

The trial court also found that Morgan breached his fiduciary duty to Christi by failing to account for large sums of community funds that "simply vanished" while under his management and control.

"[A]ccountability for the management of community assets is a fundamental aspect of the fiduciary duties owed between spouses." (*Margulis*, *supra*, 198 Cal.App.4th at p. 1269.) Viewed together, sections 721, 1100, and 1101 "impose on a managing spouse affirmative, wide-ranging duties to disclose *and account* for the existence, valuation, and disposition of all communities assets" during the marriage and from the date of separation through final property division. (*Margulis*, at pp. 1270–1271, original italics omitted, italics added.)

Here, the trial court relied on a chart prepared by Christi showing Morgan's "larger earning years" during their marriage when he was playing Major League Baseball. (Boldface and capitalization omitted.) It shows

20

between 2002 and 2008, Morgan earned $11,230,000, and his after-tax income (i.e., less 35 percent) was $7,299,500. Based on the chart, the court found that between 2002 and 2016 their family expenses totaled $2,816,000, broken down into four different time periods "as testified to by both Morgan and Christi." This left $4,483,500 of community funds that Morgan could not account for, despite being managing spouse of the estate. (See *Margulis*, *supra*, 198 Cal.App.4th at p. 1271 [imposing a "sua sponte duty on the managing spouse to advise the nonmanaging spouse of the *existence* and *value* of the community property"].)

However, the court noted this number did not include the following expenses, based on the testimony of both parties: $34,000 (truck); $57,000 (Mercedes); $60,000 (Range Rover); $80,000 (a second Range Rover); $100,000 (G-Wagon); $40,000 (Navigator); $450,000 (loss on Solana Beach home); and $300,000 (stock losses during recession). The court found these expenses totaled $821,000. The court then subtracted this number from $4,483,500, the unaccounted-for community funds, for a new total of $3,662,500. The court then awarded Christi damages of $1,831,250, or one-half of the "measure of unaccounted for monies . . . over which Morgan exercised management and control."

We conclude Christi satisfied her burden to produce prima facie evidence to establish the value of community assets that "simply vanished" while under Morgan's management and control, leaving the estate with virtually no assets at the time of separation. (See *Margulis*, *supra*, 198 Cal.App.4th at p. 1257 [the nonmanaging spouse has the initial burden to produce "prima facie evidence" to establish the value of missing assets by the managing spouse].)

21

Morgan breached his duty of disclosure to Christi by ignoring her repeated requests for information affecting the community estate, including how he was spending and investing their assets, and by preventing her equal access to information regarding the value and character of the estate, including its assets and debts. We conclude this breach further supports the finding Christi made a prima facie showing of the value of assets missing from the estate. In our view, it would be unfair, on the one hand, to hold her to more precise calculations regarding such assets when, on the other hand, Morgan, throughout the course of the marriage, kept material information from her about their finances and the value of the estate. He can't have it both ways.

"Once a nonmanaging spouse makes a prima facie showing of the existence and value of community assets in the other spouse's control . . . , the burden of proof shifts to the managing spouse to prove the proper disposition or lesser value of those assets. Failing such proof, the court should charge the managing spouse with the assets according to the prima facie showing." (*Margulis, supra,* 198 Cal.App.4th at p. 1258.)

Here, Morgan *admitted* during his deposition (read at trial) that he could not account for millions of dollars missing from the community estate. Instead, he claimed that Christi's damage award could not stand because Christi "ambushed" him with this theory of recovery, leaving him unprepared to counter the figures in her chart.[7]

We agree with Christi that her damages can be upheld based on the finding that Morgan breached his fiduciary duty of disclosure, as discussed

---

[7] Morgan objected to the proposed SOD on this ground, which the trial court overruled while observing that the "testimony at depositions provided notice of [Christi's] theory of breach of fiduciary duty" for his lack of accountability.

*ante.*  (See § 1100, subd. (e); *Kamgar*, *supra*, 18 Cal.App.5th at p. 148.)  And, based on the entirety of the record, we separately conclude substantial evidence supports the trial court's finding that Christi did not "ambush" Morgan at trial.

First, in her responses to special interrogatories in January 2022, Christi stated under oath:  "Morgan was a cash spender during our marriage. I begged and pleaded with him to use the credit cards for *tracing*, budget purposes, and to accumulate travel points but he ignored me and went to the bank weekly to withdraw cash . . . .  He would withdraw thousands of dollars per month (even toward the end of our marriage when we had nearly $100,000 in credit card debt we could not pay) and *I have no idea where he spent the money* . . . .  I wondered if he used some of this cash for drugs, alcohol, gambling or strip clubs.  *I don't know*."  (Italics added.)

Second, in the same interrogatory responses, Christi also noted that Morgan became a "day trader" between 2011 and 2013, trading "options and shorting stocks."  Christi "begged" him to stop, leading to daily arguments because she was "scared" by the high-risk investments.  She added, "He finally stopped.  *I'm not sure* if he lost a bunch of money and it scared him and that's why he stopped or if actually listened to me . . . .  *I think* he lost a big chunk of money and that's why he stopped.  *I don't know how much he made or lost doing this.  I was never on any of these accounts*."  (Italics added.)

In addition, in early April 2022, about 45 days before trial, in her Prayer for Relief re Property and Unresolved Issues Christi specifically requested that the trial court order the community "to be reimbursed from Morgan's separate estate in the amount of $5,000,000 to $8,000,000" for his breach of fiduciary duty; and that he be held responsible for "all liabilities

23

resulting from [his] wrongful conduct."  This was another indicator that Christi was seeking substantial damages from him as managing spouse.

Further, in her trial brief filed on May 11, 2022, Christi noted that "throughout the entirety of the marriage Morgan owed [her] a fiduciary duty without request to provide . . . her all material facts and information she needed so that she could exercise her right to equally manage and control the community property."  She specifically noted that in "Morgan's high earning years [playing Major League Baseball], he *grossly mishandled the parties' funds and admitted in his depo that he cannot account for millions of dollars*," and included in her trial brief portions of his deposition testimony backing up this claim.  (Italics added.)

We conclude Morgan was on notice at least four months before the May 2022 trial that Christi lacked information about what he had done with millions of dollars of community funds, other than the fact that such funds had disappeared under his management and control.  It therefore was incumbent on *him* to be prepared at trial to present evidence showing where the money went, with the risk that his failure of proof would result in his liability for the missing funds.  (See *Margulis*, *supra*, 198 Cal.App.4th at p. 1258.)

Once Christi made a prima facie showing of the estimated value of the missing funds, it was Morgan's burden to explain where the money went (i.e., *tracing* such funds through bank and brokerage account records, credit card receipts and statements, and similar evidence) (see *Margulis*, *supra*, 198 Cal.App.4th at p. 1258).  To the extent he could not account for those funds, as turned out to be the case, Morgan would be liable to Christi for one-half of such funds (see *ibid.*).  We thus reject this claim of error.

24

## E. *The Sanctions Award Was Proper*

Morgan next contends the trial court erred when it sanctioned him $100,000 under section 1101, subdivision (g) because (1) the court failed to make a finding he had the ability to pay the sanction and (2) any such finding would have been inconsistent with its separate finding that both parties lacked the financial resources to pay the other's need-based attorney fees under section 2030. We find no error.

"The objective of statutory interpretation is to ascertain and effectuate legislative intent. To accomplish that objective, courts must look first to the words of the statute, giving effect to their plain meaning. If those words are clear, we may not alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] Whenever possible, we must give effect to every word in a statute and avoid a construction making a statutory term surplusage or meaningless." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437.)

Section 1101, subdivision (g) provides: "Remedies for breach of the fiduciary duty by one spouse, including those set out in Sections 721 and 1100, *shall* include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred in breach of the fiduciary duty *plus* attorney's fees and court costs. The value of the asset shall be determined to be its highest value at the date of the breach of the fiduciary duty, the date of the sale or disposition of the asset, or the date of the award by the court." (Italics added.)

Here, the Legislature's intent is clear that if a spouse's breach of fiduciary duty falls within subdivision (g) of section 1101, the statutory remedies to the other spouse "shall" include, but not be limited to, an award of attorney fees and costs. " ' "It is a well established rule of statutory

25

construction that the word 'shall' connotes mandatory action and 'may' connotes discretionary action." ' " (*In re Marriage of Hokanson* (1998) 68 Cal.App.4th 987, 993 (*Hokanson*); accord, § 12 [" 'Shall' is mandatory and 'may' is permissive."].)

Our conclusion that an award of attorney fees and costs is mandatory under section 1101, subdivision (g) finds further support when comparing this provision to related subdivision (h), which applies when a spouse's breach of fiduciary duty involves more severe conduct. Section 1101, subdivision (h) provides: "Remedies for the breach of the fiduciary duty by one spouse, . . . when the breach falls within the ambit of Section 3294[8] of the Civil Code shall include, but not be limited to, an award to the other spouse of 100 percent, or an amount equal to 100 percent, of any asset undisclosed or transferred in breach of the fiduciary duty."

The inclusion of an attorney fees award in section 1101, subdivision (g), and the exclusion of such an award in related subdivision (h), supports our interpretation that breaches of fiduciary duty involving less severe conduct entitle the nonbreaching spouse to a *mandatory* award of attorney fees and costs, where his or her damages are capped at 50 percent of the undisclosed or transferred asset. (See *Borden v. Stiles* (2023) 92 Cal.App.5th 337, 345–346 [in interpreting a statute, " [w]e consider the provisions' language in its "broader statutory context" and, where possible, harmonize that language with related provisions by interpreting them in a consistent fashion' "], quoting *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 189.)

---

8    Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

Our conclusion that the remedies in subdivision (g) of section 1101 include a mandatory award of attorney fees and costs is consistent with other courts that have addressed this identical issue.  (See *In re Marriage of Fossum* (2011) 192 Cal.App.4th 336, 348 [trial court was "mistaken" in believing it had the discretion to refuse to award the husband attorney fees and costs for wife's breach of fiduciary duty because the language of § 1101, subd. (g) requiring such an award is "unambiguous and mandatory")]; *ibid.* ["Once a breach is shown, the trial court lacks discretion to deny an aggrieved spouse's request for attorney fees."]; *Hokanson, supra,* 68 Cal.App.4th at p. 993 [trial court "lacked discretion" to deny husband's request for attorney fees under § 1101, subd. (g) for wife's breach of fiduciary duty].)  We thus conclude the trial court was obligated to award Christi attorney fees and costs as a sanction for Morgan's breach of fiduciary duty, without regard to his ability to pay that award.

Moreover, Morgan did not oppose this sanction, including on the ground of inability to pay when he filed objections to the proposed SOD. "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . .  prior to entry of judgment . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634.)

"It is axiomatic that a party may not complain on appeal of rulings to which it acquiesced in the lower court.  [Citation.]  ' "[F]orfeiture" is the correct legal term to describe the loss of the right to raise an issue on appeal due to the failure to pursue it in the trial court.'  [Citation.]  It is unfair to the trial judge and the adverse party to attempt to take advantage of an alleged

27

error or omission on appeal when the error or omission could have been, but was not, brought to the attention of the trial court in the first instance." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 912 (*City of Porterville*).) "It follows that when a trial court announces a tentative decision, a party who failed to bring any deficiencies or omissions therein to the trial court's attention forfeits the right to raise such defects or omissions on appeal." (*Ibid.* [where cause of action not directly addressed in tentative statement of decision but no objections were raised, the party forfeits the claim on appeal]; accord *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134 (*Arceneaux*) ["The clear implication of [Code of Civil Procedure section 632], of course, is that if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment."].)

Here, because Morgan failed to oppose the $100,000 sanction in his objections to the proposed SOD, we may infer from this silence that the trial court made the implied factual finding that he had the ability to pay $100,000 in support of this portion of the judgment. (See *Arceneaux, supra,* 51 Cal.3d at pp. 1133–1134; *City of Porterville, supra,* 157 Cal.App.4th at p. 912.) For this separate reason, we reject Morgan's claim of error regarding imposition of the sanction.

Lastly, we reject Morgan's contention that the trial court made inconsistent rulings when it imposed the sanction, despite finding that neither party had the means to pay need-based attorney fees to the other under section 2030. As Christi points out, at trial she did not seek an award

of attorney fees from Morgan under this statute.  We find no inconsistency in the court's rulings.

## DISPOSITION

The judgment is affirmed.  Christi to recover her costs on appeal.  (Rule 8.278(a)(3).)


RUBIN, J.

WE CONCUR:


BUCHANAN, Acting P. J.


KELETY, J.